**LA SOCIETE NATIONALE DE CONSTRUCTION**

v.

**The UNITED STATES.**

No. 606-52.

United States Court of Claims.
March 6, 1957.

Joseph G. Blum, New York City, for plaintiff.

Kendall M. Barnes, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a suit by a French corporation to recover damages which it allegedly suffered under two contracts which it entered into with the American Graves Registration Command. One of these contracts was for the grading of a permanent cemetery at Saint Avold, France. The second was for the removal of a temporary combat cemetery at Andilly, France.

The invitation for bids was issued by the American Graves Registration Command on June 15, 1948. While the invitation for bids covered both contracts, the work was clearly in two parts. The contracts were signed separately, involved different matters, and will be treated separately.

The first contract provided for the grading of a permanent cemetery at Saint Avold, France, to which bodies were to be moved from temporary combat cemeteries. Plaintiff was to grade the rolling terrain in accordance with the design made for the cemetery by the American Battle Monuments Commission. According to the terms of the contract the topsoil was first to be removed and stored in windrows, then the terrain was to be graded by a cut-and-fill operation pursuant to the plans and specifications. The pertinent provisions of the contract are set out in findings 5 and 6. Article 15 of the contract was as follows:

"Article 15. Unit Prices: The unit prices contained in this contract are the complete price or cost per unit and include all incidental costs and charges, including any and all direct, indirect or other forms of taxes levied or assessed thereon."

The contract called for common excavation of an estimated quantity of 78,500 cubic yards of earth at 74 French francs per cubic yard. Articles 106 and 107 of the contract provided for the material to be used, the nature and distance of the hauling, and provided that the price and payment set out should constitute just compensation for all labor, equipment, tools, and incidentals necessary to complete the work.

The contract provided that plaintiff was to commence work on August 10, 1948, and that the work was to be completed by November 10, 1948. The schedule of work had been thus arranged so that plaintiff's contract would be finished by the time the reburial contractor began the interment of the bodies in the cemetery. The reburial contract had been entered into by the defendant with

another contractor for the reburial of the soldiers' bodies at Saint Avold, and reburials in that cemetery were scheduled to commence on December 6, 1948, at the rate of 175 per working day.

The time for the completion of the work at Saint Avold was important for several reasons. Most of the temporary cemeteries were located in agricultural fields and it was necessary that the lands be returned to their former function of producing food. Also the French Government desired to resume the collection of taxes on the lands temporarily used for cemeteries. Accordingly, Congress had prescribed a time limit for the completion of the reburial program as a courtesy to the French Government, which was asking for the return of the property. The coffins of the deceased soldiers had been unearthed from the temporary cemeteries and had been placed above the ground. There was danger that the coffins might catch fire, and there also appeared to have been some danger of a resumption of military operations in Europe, and the temporary cemeteries were rapidly deteriorating.

The plaintiff's progress with the work was very slow. By the completion date, November 19, 1948, only 20 percent of the grading had been finished in the Saint Avold permanent cemetery. The delay was caused by plaintiff's lack of equipment and its failure to provide proper supervision. It provided only one bulldozer, and although a second machine was later brought to the project, one of the two machines was being repaired and not in use most of the time until January 1, 1949. The foreman had only four or five men working under him and he had some difficulty getting them to report for work on time.

As a result of the delay, plaintiff's representatives were called into conference with the command engineer of the American Graves Registration Command in the hope of expediting the work. The Army agreed to and did furnish to plaintiff on a rental basis one eight-cubic-yard scraper, two tractors, one sheepsfoot roller, and 500 feet of steel cable for the re-

pair of plaintiff's equipment. Plaintiff was directed to provide better supervision. A new schedule was agreed to and adopted by the parties and plaintiff completed operations. The new schedule provided for work in certain parts of the cemetery to be finished in time to permit the reinterment operations to begin in December 1948.

To complete the grading under the revised plan it was necessary for the plaintiff to go outside the particular area being worked on in order to obtain the necessary fill material for that area. In doing so the haul was in some instances for a greater distance than it would have been had plaintiff been able to stay within the area. If, however, plaintiff had provided the equipment, labor, and supervision needed for completion of the work in accordance with the schedule made at the time the contract was entered into, the additional hauling would not have been necessary.

The plaintiff submitted invoices to the American Graves Registration Command for overhaul of earth moved a distance of more than 500 feet within the project boundaries. The contracting officer refused to pay these invoices and instructed plaintiff to submit its invoices for the regular work separately from the invoices for the amount sought for the overhaul.

On the basis of a report made by the resident engineer, the contracting officer prepared and issued an amendment to the contract to cover additional excavation hauled from the borrow area, and pursuant to this amendment plaintiff was paid 2,502,828 French francs for the 18,790 cubic yards of borrow and the overhaul in connection therewith. This was in addition to the regular stipulated payments under the contract.

Plaintiff's director of works who prepared the claim which is set out in finding 19 is no longer employed by plaintiff and did not testify at the trial. Apart from the statements made in plaintiff's claim, there is no evidence as to the amount of overhaul performed

by plaintiff, or is there any evidence of the cost incurred in such overhaul.

The claim was rejected originally by the contracting officer and on appeal by the command engineer, on the ground that no overhaul was payable under the terms of the contract for hauling within the project boundaries.

Plaintiff's claim was also reviewed and rejected by the Commanding General of the American Graves Registration Command. There is no evidence that any representative of the defendant agreed to pay the plaintiff for overhaul claimed in connection with this contract.

In addition, since any excess costs that may have been incurred were due to plaintiff's delay in furnishing the equipment and the necessary personnel to do the work within the time specified in the contract, and since there is no evidence in any event as to the amount of any overhaul or the cost thereof, there is no basis for the recovery of any damages in connection with the contract for the grading of the permanent cemetery at Saint Avold.

█ As to the second contract, the American Graves Registration Command had, on August 14, 1948, sent plaintiff an invitation to submit a lumpsum bid for the restoration of the property which had been used as an American temporary combat cemetery at Andilly, France. The purpose of the contract was to remove the cemetery and restore the land to its former condition in order that it might be returned to its owners and used for agricultural purposes. All vestiges of the American occupation were to be removed in order to forestall the filing of any claims by French citizens against the Army.

Some of the more pertinent provisions of the contract are set out in finding 23. These articles contain a description of the work, a provision that no charges should be made for extra work unless ordered in writing by the contracting officer, and a provision that all disputes concerning questions of fact should be decided by the contracting officer subject to appeal to the command engineer, whose decisions as to such questions of fact should be final.

The basis of plaintiff's claim is that in removing the cemetery and restoring the land to its previous condition the plaintiff encountered unforeseen difficulties and more than normal thickness of rubble, rock bed and metals, and that the rock bed and metals were deeper than had been anticipated, and involved conditions which could not have been foreseen in a surface examination. Plaintiff asserts that he should be paid additional sums covering the added work and expense incident to these unforeseen conditions.

The record discloses, however, that the plaintiff had previous experience in removing similar roads in other combat cemeteries and would naturally expect that there would be a considerable amount of rubble and other materials in the temporary road. These roads and cemeteries had been built under combat conditions, and the Andilly cemetery had been established while under combat fire. The road indicated on the contract drawing was a makeshift road which had been hurriedly built under emergency conditions.

In addition, Article 2, subdivision f, of the contract is as follows:

"f. Remove and dispose of all road metal, landing mats, gravel, rubble, loose rock, etc., in roads, parking area, and paths as indicated on AGRC Restoration of Property Drawing No. 112/34–2 and as directed by the Contracting Officer or his duly authorized representative."

It was the practice of the officers in the American Graves Registration Command to warn each contractor that the contract was let on a lump-sum basis, and that he should make borings and other investigations to satisfy himself as to the conditions to be encountered. At the time the invitation for bids was issued plaintiff was warned by defend-

ant's representatives in accordance with this practice.

There was no provision in this particular contract in reference to subsurface and latent conditions at the site. At the same time, had evidence been offered and the fact clearly established that the underground conditions were worse than in the normal cemeteries established under like conditions, and greater than either party had anticipated, we would be inclined to make some allowance because of the extra work involved. However, except for the statements contained in letters written to the defendant, plaintiff offered no evidence as to the conditions in the performance of its contract at Andilly, or as to the costs that may have been incurred in the removal of the subsurface materials. Also, there is no evidence of a representative of the defendant having advised plaintiff orally or in writing that it would receive additional compensation for work at the Andilly cemetery. The commissioner of this court who heard the testimony afforded the plaintiff an opportunity to prove the facts which it had mentioned in its letters. This it was unable to do. We, of course, cannot accept mere statements made in letters as being sufficient proof of essential facts such as those to which reference is made above.

The petition is dismissed.

LARAMORE, MADDEN, WHITAKER, and LITTLETON, Judges, concur.

### Findings of Fact.

The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiff is a duly organized French corporation, which has its principal office in Paris, France. Since 1919, plaintiff has been engaged in general construction work, including excavation, grading, and earth moving.

2. In 1948 plaintiff entered into two contracts with the American Graves Registration Command: the first, for the grading of a permanent cemetery at Saint Avold, France and the second, for the removal of the site of a temporary combat cemetery at Andilly, France.

3. In response to an invitation for bids issued by the American Graves Registration Command on June 15, 1948, plaintiff submitted, on the schedule provided for that purpose, a bid in two parts: Part A was for common excavation of an estimated quantity of 78,500 cubic yards of earth at 74 French francs per cubic yard, and Part B was for the stripping and storing of an estimated quantity of 4,000 cubic yards of topsoil at a price of 92 French francs per cubic yard.

4. Plaintiff's bid was accepted, and on August 2, 1948, a written contract was entered into between plaintiff and the defendant, acting through Francis L. Tagan as contracting officer, for the grading of the Saint Avold Cemetery. It was a permanent cemetery to which bodies were to be removed from temporary combat cemeteries. Plaintiff's job under the contract was to grade the rolling terrain in accordance with the design made for the cemetery by the American Battle Monuments Commission. Plaintiff was to first remove the topsoil and store it in windrows and was then to grade the terrain by a cut-and-fill operation in accordance with the plans and specifications.

5. The contract, which is in evidence as plaintiff's exhibit 1, contained the following pertinent provisions:

"Article 1. *General:* This contract covers compensation for all work described in specifications and drawings attached hereto and made a part of this contract and executed by The Contractor for the Contracting Officer, Headquarters, American Graves Registration Command, European Area. The work shall be commenced on 10 August 1948 and completed on 10 November 1948.

"Article 2. *Description Of The Work:* For the contract price as

stated, The Contractor will perform the following work at Saint Avold Cemetery in the Commune of Saint Avold, Moselle, France, at the site shown on Plan No. 107/30–32 (Revised 29 July 1948).

"a. Within the limits of the project boundary shown on Plan No. 107/30–32 (Revised 29 July 1948), the earth will be graded and brought to the final grade elevations shown on Plan No. 107/30D–33. All earth embankment will be compacted in eight inch layers by suitable compacting machinery.

"b. Topsoil within the project boundary on areas indicated on Plan No. 107/30–32 (Revised 29 July 1948) will be stripped and stored in windrows at a location outside the project boundary to be designated by the Contracting Officer or his duly authorized representative. The exact location and depth of this topsoil to be stripped will be determined by the Contracting Officer or his duly authorized representative.

\* \* \* \* \* \*

"Article 10. *Superintendence by Contractor:* The Contractor shall give his personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during the progress thereof with authority to act for him.

\* \* \* \* \* \*

"Article 13. *Other Contracts:* The United States Government may award other contracts for additional work and The Contractor shall fully cooperate with such other contractors and carefully fit his own work to that provided under other contracts as may be directed by the Contracting Officer. The Contractor shall not commit or permit any act which will interfere with the performance of work by any other contractor.

\* \* \* \* \* \*

"Article 15. *Unit Prices:* The unit prices contained in this contract are the complete price or cost per unit and include all incidental costs and charges, including any and all direct, indirect or other forms of taxes levied or assessed thereon.

\* \* \* \* \* \*

"Article 19. *Method of Measurement:* The yardage to be paid for shall be the number of cubic yards measured in original position."

In addition the contract contained the provisions customarily found in the standard form of Government construction contract under the following titles:

"*Changes* (Article 5)
"*Changed Conditions* (Article 6)
"*Extras* (Article 7)
"*Delays–Damages* (Article 11)
"*Disputes* (Article 14)"

6. The specifications, which were made a part of the contract, contained the following pertinent articles:

"Stripping and Storing Topsoil
"*Description*
"Art. 68. This article shall consist of removing topsoil, and transporting and depositing it in storage piles, in accordance with these specifications.

"*Construction Methods*
"Art. 69. The areas from which stripping of topsoil may be required shall be as indicated on the plans. The contractor shall remove topsoil from such portions of these areas and to such depths as the contracting officer may direct. No stripping of topsoil over any designated area shall be less than 6 inches (15 centimeters) in depth. The topsoil removed shall be transported and deposited in storage piles at locations designated by the contracting officer.

"The topsoil shall be kept separate from other excavated materials and shall be completely removed to the required depth from any designated

area prior to the beginning of regular excavation or embankment work in the area. If topsoil is removed to a greater depth than directed by the contracting officer, payment will be made only for the amount of topsoil directed to be removed.

*"Method of Measurement*

"Art. 70. The yardage to be paid for shall be the number of cubic yards measured in original position and computed by average and area method, of topsoil acceptably stripped and stored as hereinabove prescribed.

*"Basis of Payment*

"Art. 71. The yardage, determined as provided above, shall be paid for at the contract unit price per cubic yard for 'Stripping and Storing Topsoil', which price and payment shall constitute full compensation for removing the topsoil, transporting and depositing in storage piles, and for all labor, equipment, tools and incidentals necessary to complete the article, except Overhaul.

"Plot and Drainage Excavation

*"Description*

"Art. 72. This article shall consist of excavating and grading the grave plot areas, * * * all in accordance with these specifications and in conformity with the lines, grades and dimensions as shown on the plans or as stated by the contracting officer. * * *

\* \* \* \* \* \*

"Art. 74. *Classification.*—(a) Unless the bid schedule calls for 'Solid Rock Excavation' and/or 'Common Excavation', all excavation under this article shall be considered 'Unclassified Excavation' regardless of the nature of the material excavated, * * *

\* \* \* \* \* \*

"(c) Common excavation, when this classification is called for in the bid schedule, shall consist of all excavation under this article not included in solid rock excavation.

\* \* \* \* \* \*

*"Method of Measurement*

"Art. 83. The yardage to be paid for shall be the number of cubic yards measured in original position and computed by average and area method, of material acceptably excavated as hereinabove prescribed.

\* \* \*

*"Basis of Payment* ·

"Art. 84. The yardage, measured as provided above, shall be paid for at the contract unit prices per cubic yard for 'Unclassified Excavation, Unit B' etc., or 'Solid Rock Excavation', and/or 'Common Excavation', as the case may be, which prices and payment shall constitute full compensation for (a), (b), (c) and (d) below, and for all labor, equipment, tools and incidentals necessary to complete the article save the exceptions stated below.

"(a) The excavating and hauling (except overhaul) and the forming and compacting of embankments, except as otherwise provided under Embankment.

\* \* \* \* \* \*

"Borrow

*"Description*

"Art. 93. This article shall consist of excavating approved material from borrow pits, when sufficient quantities of suitable material are not available from other excavations and the disposing of all excavated material, all in accordance with these specifications and in conformity with the lines, grades and dimensions shown on the plans or as directed by the contracting officer.

\* \* \* \* \* \*

"Art. 95. *Selection of Sources.*— Material for this article shall be obtained under the terms of case 1 and/or case 2 described below.

"Case 1.—When case 1 is called for in the bid schedule, the sources or

borrow material shall be indicated on the plans and/or designated by the contracting officer, and the contractor shall be relieved of the responsibility of obtaining the right to take the materials from such sources.

"Case 2.–When directed by the contracting officer to furnish material under case 2, the sources of borrow material shall be selected by the contractor and he shall obtain the right from the owners to procure material from such sources, shall pay all royalty and other charges involved, and shall bear all the expense of developing the sources, and of hauling and placing the material.

\* \* \* \* \* \*

### "Method of Measurement

"Art. 100. The yardage to be paid for shall be the number of cubic yards of material (including the yardage of overburden stripped from pits) measured in original position and computed by average and area method, excavated and acceptably disposed of in embankment, backfill or as otherwise ordered \* \* \*.

### "Basis of Payment

"Art. 101. The yardage, measured as provided above, shall be paid for at the contract unit price per cubic yard for 'Unclassified Excavation for Borrow, Case 1', or 'Unclassified Excavation for Borrow, Case 2', as the case may be, which price and payment shall constitute full compensation for (a), (b), (c) and (d) below, when case 1 governs the article, or full compensation for (e), (f), (g) and (h) below, when case 2 governs the article, and for all labor, equipment, tools and incidentals necessary to complete the article save several exceptions as stated.

"(a) The excavating and hauling and the forming and compacting of embankments, except as otherwise

provided under Embankment and except overhaul.

\* \* \* \* \* \*

### "Overhaul (Station-Yard Basis)
### "Description

"Art. 102. This article shall consist of authorized hauling, in excess of the free haul distance, of any material paid for under Plot And Drainage Excavation, Borrow (Case 1), Unclassified Excavation For Structures, Stripping And Storing Topsoil, or Replacing Topsoil and disposed of under the various articles prescribes for the disposal of such material; provided, however, that it shall not include the hauling of any material that is paid for under Borrow if the bid schedule includes an estimated quantity for Special Overhaul Of Borrow, or paid for under Borrow (Case 2) in any event.

"The free haul distance shall be 500 feet (150 meters) or 1,000 feet (300 meters), whichever is called for in the bid schedule. Only one free haul distance shall be provided in any one contract.

### "Method of Measurement

"Art. 103. The number of station-yards of overhaul to be paid for shall be the product of the volume of the overhauled material, measured in its original position, in cubic yards, by the overhaul distance in feet, divided by 100. The overhauled material shall be the material comprehended within the terms of 102 above and hauled as directed more than the free haul distance (as designated in the bid schedule). The overhaul distance shall be the distance between the centers of volume of the overhauled material in its original position and after placing, less the free haul distance (as designated in the bid schedule).

"The haul distance for material moved from outside the plot prism

shall be measured along the shortest route determined by the contracting officer as feasible and satisfactory. If the contractor chooses to haul the material over some other route, and such route is longer, the computations for payment shall be based on the haul distance measured along the route designated by the contracting officer. The haul distance for material obtained from the plot prism and placed within the work shall be the distance measured along the center line of the cemetery.

### "Basis of Payment

"Art. 104. The station-yards, determined as provided above, shall be paid for at the contract unit price per station-yard for 'Overhaul (500 feet (150 meters) free haul)', or 'Overhaul (1,000 feet (300 meters) free haul)', as the case may be, which price and payment shall constitute full compensation for all labor, equipment, tools and incidentals necessary to complete the article.

### "Special Overhaul of Borrow "(Cubic-Yard-Mile Basis)

### "Description

"Art. 105. This article shall consist of authorized hauling in excess of the free haul distance of any material paid for under Borrow (Case 1) and disposed of as required under the various articles prescribed for the disposal of such material.

"The free haul distance shall be 500 feet (150 meters) or 1,000 feet (300 meters), whichever is called for in the bid schedule. Only one free haul distance shall be provided in any one contract.

### "Method of Measurement

"Art. 106. The number of cubic-yard-miles of special overhaul of borrow to be paid for shall be the product of the volume of the overhauled material, measured in its original position, in cubic yards, by the overhaul distance in miles and fractions thereof. The overhauled material shall be the material comprehended within the terms of 105 above and hauled as directed more than the free haul distance (as designated in the bid schedule). The overhaul distance shall be the distance between the centers of volume of the overhauled material in its original position and after placing, less the free haul distance (as designated in the bid schedule).

"The haul distance shall be measured along the shortest route determined by the contracting officer as feasible and satisfactory. If the contractor chooses to haul the material over some other route, and such route is longer, the computations for payment shall be based on the haul distance measured along the route designated by the contracting officer.

### "Basis of Payment

"Art. 107. The cubic-yard-miles, determined as provided above, shall be paid for at the contract unit price per cubic-yard-mile for 'Special Overhaul of Borrow (500 feet (150 meters) haul)' or 'Special Overhaul of Borrow (1,000 feet (300 meters) free haul)' as the case may be, which price and payment shall constitute full compensation for all labor, equipment, tools and incidentals necessary to complete the article."

7. Plaintiff did not submit any bids covering and there were no contract unit prices for the following:

(1) "Unclassified Excavation for Borrow, Case 1", referred to in paragraph 101 of the specifications;

(2) "Unclassified Excavation for Borrow, Case 2", referred to in paragraph 101 of the specifications;

(3) "Overhaul (500 feet free haul)," referred to in paragraph 104 of the specifications, and

(4) "Special Overhaul of Borrow", referred to in paragraph 107 of the specifications.

Neither plaintiff's bid nor the contract contained a provision specifying whether the free haul distance for overhaul, as provided for in paragraph 102 of the specifications, would be 500 feet or 1,000 feet.

8. The American Graves Registration Command had a staff headquarters in Paris headed by General Peckham, the commanding general. Colonel Troland, the command engineer, was in charge of the Engineering Section, and his assistants were Major Tagan, the contracting officer, Mr. Belt, an engineering assistant, and Mr. Parker, a design engineer.

There was also a local zone organization for the third zone in which the Saint Avold Cemetery was located. Colonel Marchman was the zone commander, and among the personnel who served under him were Mr. Psychogios, the resident engineer at Saint Avold, and Mr. Stevenson, the superintendent of the cemetery. The zone commander was responsible to the commanding general, and such responsibility extended to everything within the zone, including engineering work. There was also a line of technical responsibility from the resident engineer to the command engineer.

9. The contract provided that plaintiff was to commence work on August 10, 1948, and to complete it by November 10, 1948. This schedule of work had been arranged in order that plaintiff's contract would be finished by the time the reburial contractor began the interment of bodies in the cemetery. The defendant had entered into an agreement with another contractor for the reburial of the soldiers' bodies at Saint Avold, and the reburials in that cemetery were scheduled to commence on December 6, 1948, at the rate of 175 per working day.

10. The American Graves Registration Command had to complete the removal of the bodies of the deceased soldiers from the temporary combat cemeteries as soon as possible. For a number of reasons, the removal of the bodies from the temporary cemeteries to Saint Avold could not be delayed.

Congress had prescribed a time limit for the completion of the reburial program, and the French Government was asking for the return of the temporary properties. Most of the temporary cemeteries were located in agricultural fields, and it was necessary that the lands be returned to their former function of producing food. The French political entities desired to resume the collection of taxes on the lands temporarily used for cemeteries.

The coffins of the deceased soldiers had been unearthed from the temporary cemeteries and had been placed above the ground. There was danger that the coffins might catch fire and that a scandal would be created. There was also some possibility that there would be a resumption of military operations in Europe and, if that occurred, the American Graves Registration Command might be forced to withdraw and leave the coffins on top of the ground.

The caretaker personnel for the combat cemeteries had been sent home, and the cemeteries were rapidly deteriorating.

11. Until late in the fall of 1948, plaintiff's progress with the work was very slow. When one-third of the contract time had elapsed, only five percent of the work had been done. Although the contract was to have been completed by November 10, 1948, only 20 percent of the grading had been finished by that time.

The delay in the work was due to plaintiff's lack of equipment and to its failure to provide proper supervision. At first, plaintiff provided only one bulldozer, and although a second machine was later brought to the project, one of the two machines was being repaired and not in use most of the time until about January 1, 1949. By that date, plaintiff had three pieces of equipment in operation and was making satisfactory progress.

The first foreman plaintiff placed on the job accomplished little. He had only four or five men working under him, and he had difficulty in getting them to report for work on time. In the latter part

of October or early in November 1948, plaintiff provided a new foreman who was more efficient and was able to get more work from the men. In addition, the working force was increased from five to twelve men.

12. As a result of plaintiff's lack of progress, its representatives were called into conference with the command engineer in October 1948, and several steps were taken to expedite the work. The Army agreed to and did furnish to plaintiff on a rental basis one eight-cubic-yard scraper, two tractors, one sheepsfoot roller, and 500 feet of steel cable for the repair of plaintiff's equipment. Plaintiff was directed to provide better supervision. Mr. Parker was sent to the site to develop a new schedule of work with plaintiff's representatives and the resident engineer. The new schedule was adopted by the parties, and plaintiff completed operations under that schedule.

13. The original grading plan for the project did not require plaintiff to haul earth for a distance of more than 500 feet within the project limits. However, the new schedule of work, which was prepared by Mr. Parker and agreed to by plaintiff in the late fall of 1948, changed the grading plan in order that the work in certain parts of the cemetery would be finished in time to permit the reinterment operations to begin in December of 1948. To complete the grading under the revised plan, it was often necessary for the plaintiff to go outside the particular area being worked on, in order to obtain the necessary fill material for that area. As a result, plaintiff had to haul earth within the site over distances which exceeded 500 feet in length. In one particular area, there was a deep ravine and plaintiff had to go a considerable distance in order to obtain the earth needed for filling the ravine. Some additional hauling in excess of 500 feet within the project limits was also occasioned by the fact that plaintiff had to detour around pools of water and piles of topsoil. If plaintiff had provided the equipment, labor, and supervision needed for the completion of the work in accordance with the schedule made at the time the contract was entered into, the additional hauling in excess of 500 feet within the boundaries of the property would not have been necessary.

14. At the time the contract was signed, the parties contemplated. that the cuts would provide sufficient material for the fills and that no borrow material outside the plot would be required. However, the use of the heavy machinery caused a compaction which resulted in a 21-percent shrinkage in the soil, and plaintiff was required to go outside the project limits to obtain an additional 18,790 cubic yards of common excavation for fill.

15. The contract did not contain a provision requiring the plaintiff to pay liquidated damages for failure to complete the contract within the time specified. The time for completion was extended by the contracting officer as follows:

"From November 10, 1948, to March 25, 1949.

"From March 25, 1949, to April 29, 1949."

The work was completed on April 29, 1949.

16. On May 4, 1949, after the completion of the contract, the resident engineer submitted to the contracting officer the following report which covered the excavation, hauling, and placement of the additional borrow material needed:

"1. A revised report has been prepared for the week ending 30 April 1949 so as to include all additional excavation hawled [sic] from the borrow area.

"2. All work in the grading contract was completed last week. Final quantities are as follows:
"Top Soil............... 8,053c.y.
"Common Excavation (In
    original contract)....85,215c.y.
"Additional Excavation (To
    complete the project).18,790c.y.

"3. The additional excavation is subject to extra costs for overhawl

[sic]. A study prepared to determine the distance between the centers of gravity of the two masses (borrow and placement areas) shows a theorectical [sic] distance of about 650 feet. Actually however, the distance traveled was much greater. The reasons for longer hawl [sic] are:

"a. Detouring around the Top-Soil pile.

"b. Standing water and soft spots in the low area forced the equipment to follow higher ground further west and unload from the north.

"c. It was exacted that the material from the borrow area be scraped in shallow layers so as to maintain the configuration of the resulting area as much as possible, similar to the original ground surface. Mr. Bucheron, the Contractor's Superintendent in the project, kept a careful account of the number of trips and the distances traveled. Some of the distances are well above 1000 feet. After careful consideration of the above condition, I feel that 900 feet is a fair figure to assume as the basis for the computation of unit price for the additional excavation of 18,-790 cubic yards.

"4. Excepting the length of time, due to the insufficient [sic] equipment, the contractors have met all the requirements and did everything possible to complete the project to our satisfaction. I take pleasure in recommending them for future Government work."

17. On the basis of the report made by the resident engineer, the contracting officer prepared and issued an amendment to the contract. The amendment, which was dated March 6, 1949, made the following additions to and changes in the contract:

BID SCHEDULE

FREE HAUL DISTANCE OF FIVE HUNDRED FEET (500') (150 METERS) IN ACCORDANCE WITH ARTICLE 102 OF THE SPECIFICATIONS

| ITEM | PAGE | ART. | ESTIMATED QUANTITY | PAY NAMES WITH UNIT BID PRICE WRITTEN IN WORDS | UNIT BID PRICE | AMOUNT BID |
|---|---|---|---|---|---|---|
| A. | 48 | 72 | 85,215 | Cubic yards, common excavation at *Seventy-Four French Francs* per cubic yard. | 74. | 6,305,910 |
| B. | 46 | 68 | 8,053 | Cubic yards, stripping and storing top soil at *Ninety-two French Francs* per cubic yard. | 92. | 740,876 |
| C. | 65<br>66 | 102<br>103<br>104 | 18,790 | Cubic yards, common excavation (borrow) and overhaul at *One hundred and thirty-three French Francs twenty centimes* per cubic yard. | 133.20 | 2,502,828 |

TOTAL FRENCH FRANCS.................. 9,549,614

Pursuant to the above-quoted amendment, plaintiff was paid 2,502,828 French francs for the 18,790 cubic yards of borrow and the overhaul in connection therewith.

The evidence does not disclose how the unit price of 133.20 francs was arrived at. However, it was apparently computed by using the contract unit price for common excavation in the following formula:

$$74 \text{ francs times} \frac{900 \text{ feet}}{600 \text{ feet}} = 133.20 \text{ francs}$$

18. Plaintiff's foreman kept records of all material hauled within the project limits in excess of 500 feet and periodically reported this information to plain-

tiff's director of works. Copies of the same report were also given to defendant's resident engineer.

After the reburial contractor commenced work in the cemetery, plaintiff submitted invoices to the American Graves Registration Command for overhaul of earth moved a distance of more than 500 feet within the project boundaries. The contracting officer refused to pay these invoices and instructed plaintiff to submit its invoices for the regular work separately from the invoices for the claimed overhaul.

At the time of the trial, plaintiff did not have or offer in evidence the foreman's records of the overhaul claimed by plaintiff, and the defendant has been unable to locate any copies thereof in its files or records centers.

19. On May 17, 1949, after the contract had been completed, plaintiff submitted to defendant a written claim in the sum of 3,689,948.75 French francs for overhaul of common excavation and topsoil in excess of 500 feet within the project limits. The letter, which explained how plaintiff's claim was computed, read in pertinent part as follows:

"According to the data contained in our site reports this average haul (for the whole of the earthwork, within the limits of the project, and surveyed in agreement with your Representative at Saint-Avold, but excluding the conveyance of borrowed earth outside of these limits), is of 523 feet for top soil and 790 feet for the remainder, as evidenced by the enclosed statement.

"We hereby request you to take into consideration this overhaul for the establishment of the final accounts and to raise our contract prices as follows:

—for top soil $\ldots\ldots$ Frs. $92 \times \dfrac{523}{500} = 96.25$ per cubic yard

—for remainder of excavated material $\ldots\ldots$ Frs. $74 \times \dfrac{790}{500} = 116.90$ per cubic yard

Excess:
—for top soil $\ldots\ldots$ $96.25 - 92 = 4.25$ per cubic yard
—for common excavation $\ldots\ldots$ $116.90 - 74 = 42.90$ per cubic yard

"and we hereby request the reimbursement thereof."

The provisions of the specification relating to overhaul, including the method of measurement and the basis of payment, are paragraphs 102, 103, and 104. As stated in finding 7, there was no contract unit price per station-yard for "Overhaul (500 feet free haul)" or "Overhaul (1,000 feet free haul)", as referred to in paragraph 104 of the specifications.

Plaintiff's director of works, who prepared the above-described claim, is no longer employed by plaintiff and did not testify at the trial. Aside from the statements made in plaintiff's claim, there is no evidence as to the amount of overhaul performed by plaintiff within the project limits, or as to the cost incurred in such overhaul.

20. Plaintiff's claim was rejected originally by the contracting officer and on appeal by the command engineer, on the ground that no overhaul was payable under the terms of the contract for hauling within the project boundaries. Plaintiff's claim was also reviewed and rejected by the commanding general.

Plaintiff has exhausted the administrative remedies provided for in the contract.

21. There is no evidence that any representative of defendant agreed to pay plaintiff for the overhaul claimed by it in this action.

22. On August 14, 1948, the American Graves Registration Command sent

plaintiff an invitation to submit a lump-sum bid for the restoration of the property which had been used as an American temporary combat cemetery at Andilly, France. The invitation called for the performance of twelve separate items of work. After the cessation of hostilities, the bodies which had been temporarily buried at Andilly were removed. The purpose of the contract was to remove the site of the cemetery and to restore the land to its former condition in order that it might be returned to its owners and used for agricultural purposes. All vestiges of the American occupation were to be removed in order to forestall the filing of any claims by French citizens against the Army.

23. Plaintiff's bid was accepted, and on October 1, 1948, plaintiff and the defendant, acting through Francis L. Tagan as contracting officer, entered into a written contract for the restoration of the site of the cemetery. The contract, which is in evidence as plaintiff's exhibit 18, provided in pertinent part as follows:

"Article 1. *General:* This contract covers compensation for all work described in the drawing attached hereto and made a part of this contract and executed by The Contractor for the Contracting Officer, Headquarters, American Graves Registration Command, European Area. The work shall be commenced on 11 October 1948 and completed on 26 November 1948.

"Article 2. *Description of the Work:* For the contract price as stated, The Contractor shall perform the following work in connection with the restoration of the site at the United States Military Cemetery at Andilly, situated in the Commune of Andilly, Meurthe et Moselle, France, as indicated on AGRC Restoration of Property Drawing No. 112/34–2.

\* \* \* \* \* \*

"f. Remove and dispose of all road metal, landing mats, gravel, rubble, loose rock, etc., in roads, parking area, and paths as indicated on AGRC Restoration of Property Drawing No. 112/34–2 and as directed by the Contracting Officer or his duly authorized representative.

"Article 3. *Extras:* Except as otherwise herein provided, no charges for any extra work or material will be allowed unless the same has been ordered in writing by the Contracting Officer and the price stated in such order.

"Article 5. *Lump Sum Price:* The lump sum price contained in this contract is the complete cost and includes all incidental costs and charges, including any and all direct, indirect, or other forms of taxes levied or assessed thereto.

"Article 12. *Disputes:* Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer or his duly authorized representative, subject to written appeal by The Contractor within thirty days to the Command Engineer, American Graves Registration Command, European Area, whose decision shall be final and conclusive upon the parties thereto as to such questions of fact. In the meantime, The Contractor shall diligently proceed with the work as directed."

The contract did not contain the article commonly included in Government construction contracts under the title "Changed Conditions" or any similar provision relating to subsurface or latent conditions.

24. A drawing which had been prepared by the defendant was annexed to and made a part of the contract. The words "Remove 15′ Gravel Road" appeared on that part of the drawing indicating the road.

25. The Andilly Cemetery had been established under combat conditions and was under fire at that time. The road indicated on the contract drawing was a makeshift road which had been hurriedly

built under emergency conditions. It was used by heavy, six-wheeled, Army trucks moving in and out of the cemetery under combat conditions. No proper foundation for the road was laid and no system of drainage was provided. In order to move the heavy vehicles, Army personnel used any material that was available to make the roadway, including rubble and steel landing mats. These mats were long pieces of steel pierced with holes.

The roadway was situated on a low site near a lake. The lowness of the site and the proximity of the road to the lake were readily apparent to anyone who visited the site.

26. Prior to the time the contract was entered into, the American Graves Registration Command made a surface survey of the site of the cemetery, but did not make any subsurface borings or other explorations to determine the depth of the roadway. However, from previous experience in the removal of similar roads in other combat cemeteries, the defendant's representatives expected that there would be a considerable amount of rubble and other material in the temporary road. Because of their knowledge and experience of the conditions which might be expected, it was the practice of the officers in the American Graves Registration Command to warn each contractor that the contract was let on a lump-sum basis and that he should make borings and other investigations to satisfy himself as to the conditions to be encountered. At the time the invitation for bids was issued, plaintiff was warned by defendant's representatives in accordance with the practice.

27. After visiting the site, plaintiff submitted its bid with a letter which read in part as follows:

"We have much pleasure in letting you know that after having examined the files of this concern and visited the spot, we are willing to do the work required, to the terms foreseen by your Book of Charges, for the global contract-price of 4,500,- 000 Francs, (Four million five hundred thousand Francs).

"Hoping this price will meet with your approval, * * * "

28. On January 29, 1949, after work on the contract had begun, plaintiff wrote the contracting officer as follows:

"We have the honor of confirming the fact that while tearing out the roads on the Antilly [sic] project we found metal landing mats buried at various depths.

"In addition, for almost a month we have been kept busy tearing out clumps of brushwood averaging 1.20 meters in height, over an area of about 2,000 square meters of road, whereas the normal border of the road was about thirty centimeters.

"This of course results in work for us on which we had not estimated and we request that we be granted an extra price for this.

"We should be very happy if the quantities for the landing mats found in the excavation work and the extra yardage for brushwood could be counterchecked officially. * * "

In a reply letter of February 17, 1949, plaintiff was advised that the work described as an "Extra" in its letter was included in the description of work in the contract under Article 2f.

29. On March 14, 1949, plaintiff wrote the contracting officer in part as follows:

"Article 2, 'Description of the work', paragraph 'f' to which you refer in your letter applies to the normal work of tearing out a road and removing landing mats which are visible. However, our protest applies to the landing mats which we have encountered *in the excavation work,* invisible from the surface and which we could not foresee at the time we submitted our bid. In addition, we are at present encountering in the course of tearing out the road, a rock bed more than a meter and a half thick, the stones often being of such dimensions that it is neces-

sary to break them up before loading them on the trucks. This is far from constituting normal work, the usual thickness of rubble in a road never exceeding 30 to 40 centimeters."

Plaintiff's letter further stated that it could not have foreseen the conditions described at the time the contract was executed and claimed that such conditions constituted subsurface and latent conditions at the site within the meaning of Article 23 of the specifications.

Article 23 of the specifications referred to in the letter was included in plaintiff's contract for the grading of the Saint Avold Cemetery but was not made a part of the contract for the restoration of the Andilly Cemetery. Plaintiff was so informed by defendant's letter of May 11, 1949.

30. Plaintiff presented a formal claim in the amount of 1,641,517 French francs for the additional expenses it alleged it had incurred in moving subsurface road material at Andilly. The claim was denied both by the contracting officer and on appeal by the command engineer.

31. On October 3, 1949, plaintiff again wrote the contracting officer requesting payment of its claim and stated in part as follows:

"1. *Andilly.* In our claim of 25 April we requested, supported by justifications and estimates, the amount of 1,641,517 francs, representing our expenses covering work which is not possible to consider as coming within the intent of Article 2, Paragraph f, as you specified in your letter to us on 11 May 1949.

"We are willing to believe, as you tell us, that the General Specifications which you gave us at the time the contract was entered into apply to the project at St. Avold and not to the Andilly project, it nevertheless remains that the dimension of the road metal of 1½ meters deep and the removal of landing mats buried in the ground at that depth could not come within the terms of Article

2, Paragraph f, as this job constitutes the demolishing of a piece of work not in conformity with generally recognized regulations, since, in France, as in the United States certainly, the road metal never exceeds a depth of 30 to 40 centimeters; this being, as a matter of fact, the depth which we encontered [sic] everywhere else.

"As it was never specially indicated that this thickness could be greater in certain places and as no tests or cross sections of the ground had ever been furnished to us, we could not foresee this work.

"Please note, moreover, that it was not necessary to go down to such a depth in order to bring the ground to grade, but that your representative on the job asked us to tear out and dispose of all the road metal and to backfill with earth. We executed this work in accordance with orders received, logically thinking that the United States Government would pay for the extra work.

"If this depth, instead of being 1.30 meters, had been 10 or 50 meters, we wonder what your point of view would have been. This is why we ask that you be kind enough to restudy the question in a spirit of justice and we are persuaded that, all things considered, you cannot but give us satisfaction."

In each instance, plaintiff's claim was rejected on the ground that Article 2f of the contract required plaintiff to do the work for which it claimed additional compensation.

32. Except for the statements contained in letters written to defendant, plaintiff offered no evidence as to the conditions encountered in the performance of its contract at Andilly or as to the costs incurred in the removal of the subsurface material.

33. There is no evidence that any representative of the defendant advised plaintiff orally or in writing that it would

receive additional compensation for work at the Andilly Cemetery.

### Conclusion of Law.

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.